UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

BRANDON OWEN,                    )
                                 )
                    *Plaintiff,* )
                                 )
          v.                     )     CAUSE NO. 3:21-CV-765 RLM-MGG
                                 )
WILLIAM HYATTE and               )
GEORGE PAYNE, JR.,               )
                                 )
                  *Defendants*   )


OPINION AND ORDER

Brandon Owen has sued Warden William Hyatte and Deputy Warden George Payne, Jr., in their individual capacities, alleging that they subjected him to unconstitutional conditions of confinement while he was imprisoned at Miami Correctional Facility. Mr. Owen sued from prison, so the Prison Litigation Reform Act's requirement that he exhaust all administrative remedies before suing over prison conditions applies. *See* 42 U.S.C. § 1997e(a). The defendants have moved for summary judgment, and Mr. Owen has cross-moved for summary judgment, on the issue of exhaustion of administrative remedies. Mr. Owen requests oral argument to present legal arguments but not additional evidence. Neither party requested a <u>Pavey</u> hearing. *See* <u>Pavey v. Conley</u>, 544 F.3d 739 (7th Cir. 2008).

For reasons explained in this opinion and order, the court DENIES the defendants' motion for summary judgment [Doc. 17], GRANTS Mr. Owen's

motion for summary judgment, [Doc. 32], and DENIES AS MOOT Mr. Owen's request for oral argument. [Doc. 46].[1]

LEGAL STANDARD

A party is entitled to summary judgment when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). On cross-motions for summary judgment, a court "constru[es] all facts and draw[s] all reasonable inferences in favor of the party against whom the motion under consideration was filed." Hess v. Bd. of Trs. of S. Ill. Univ., 839 F.3d 668, 673 (7th Cir. 2016) (citation omitted). A party can't merely allege a disputed material fact to defeat summary judgment; "instead the nonmovant must present definite, competent evidence in rebuttal," Parent v. Home Depot U.S.A., Inc., 694 F.3d 919, 922 (7th Cir. 2012), and "must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." Hemsworth v. Quotesmith.com, Inc., 476 F.3d 487, 490 (7th Cir. 2007); see also Fed. R. Civ. P. 56(e)(2).

A defendant isn't entitled to a jury trial on contested issues involving exhaustion. Wagoner v. Lemmon, 778 F.3d 586, 590 (7th Cir. 2015) (discussing Pavey v. Conley, 544 F.3d 739 (7th Cir. 2008)). A court holds a Pavey hearing to resolve issues of fact bearing on exhaustion, but "[w]hen there are no disputed

---

[1]     Mr. Owen's action was consolidated for pretrial, non-dispositive matters with several other cases with similar allegations against the same defendants, [Doc. 11], and he requests consolidated oral argument. [Doc. 46]. The exhaustion defense is a dispositive matter, so the court resolves the issue in separate orders.

facts regarding exhaustion, only a legal question, the court may resolve the issue without a hearing. Vela v. Ind. Dep't of Corr., No. 3:16 CV 51, 2017 U.S. Dist. LEXIS 9279, at *2 (N.D. Ind. Jan. 24, 2017).

BACKGROUND

Brandon Owen alleges that Warden Hyatte and Deputy Warden Payne violated his constitutional rights when they kept him in two restrictive housing unit cells at Miami Correctional Facility for approximately sixty days starting on January 5, 2021. He alleges that the cell windows were covered with sheet metal and didn't have working lights. Live wires dangled from the ceiling, shocked him, and started a fire. He was kept in darkness for his sixty or so days in restrictive housing. Mr. Owen claims this treatment violated his Eighth Amendment right to be free from cruel and unusual punishment and he seeks to hold Warden Hyatte and Deputy Warden Payne accountable by way of 42 U.S.C. § 1983.

Mr. Owen sued from prison, so the defendants aren't liable if they can show that Mr. Owen didn't exhaust administrative remedies available to him. See 42 U.S.C. § 1997e(a).

*Miami Correctional Facility's Administrative Remedies*

Miami Correctional Facility receives and manages prison grievances according to the Indiana Department of Correction's Offender Grievance Process, Policy and Administrative Procedure 00-02-301, effective since September 1, 2020. In broad strokes, the policy requires that a prisoner complete a formal

3

grievance and two appeals to exhaust a claim. The parties agree that the written policy is as follows.

A prisoner can complain about prison conditions by filing a grievance with the prison. The prison considers only certain issues appropriate for the grievance process, like staff treatment, medical or mental health, acts of reprisal, and other concerns about conditions of care and supervision in prison. A prisoner starts by completing a grievance on State Form 45471, to be completed no later than ten business days from the date of the incident giving rise to the complaint. An offender grievance specialist is to review any grievance within five business days of receiving the grievance. A specialist either rejects the grievance or accepts and records it. A grievance specialist can reject a grievance if it is untimely, relates to more than one event or issue, is illegible, and the like. A rejected grievance is returned to the prisoner with State Form 45475, "Return of Grievance." It is not appealable, but a prisoner can submit a revised State Form 45475 within five business days of when the grievance is returned.

If a grievance specialist accepts the grievance, the grievance is logged into the prison's computer system and filed with any other grievances filed by that same prisoner. The grievance is marked on the prisoner's log with "I – Formal Grievance." The grievance specialist has fifteen business days to investigate and give a response.

A prisoner who is dissatisfied with the prison's response can appeal the response with State Form 45473. Any appeal is due within five business days of the date of the grievance response. A prisoner can also appeal a grievance if

there's no response within twenty business days of when the grievance specialist received the response. An offender grievance specialist is to log the date of receipt of the appeal and forward the appeal to the warden. The warden or his designee is to review the appeal within ten business days of receiving the appeal, and the offender grievance specialist is to give a copy of the appeal response to the prisoner.

A prisoner dissatisfied with the warden's decision can lodge an appeal with the Indiana Department of Correction. The prisoner must check the "disagree" box on the warden or his designee's response and submit the response with the completed State Form 45473 and any supporting documentation. This appeal must be made to the offender grievance specialist within five business days of the warden or his designee's appeal response. A prisoner can also appeal if there's no response within ten business days of when the warden received the first-level appeal. The offender grievance specialist is to document the appeal in the grievance database, logging the prisoner's grievance history with "II – Formal Appeal." An appeal of the warden's decision is reviewed by the Department Offender Grievance Manager and is considered final.

The parties disagree over how this policy was implemented and how Mr. Owen used the grievance process.


*Warden Hyatte and Deputy Warden Payne's Account*

Warden Hyatte and Deputy Warden Payne assert that Mr. Owen didn't exhaust the grievance process. Their evidence includes the Indiana Department

of Correction's Offender Grievance Process, Policy and Administrative Procedure 00-02-301, [Doc. 17-2], Mr. Owen's grievance history, [Doc. 17-3], and a declaration of Michael Gapski, a grievance specialist at Miami Correctional Facility, [Doc. 17-1].

Mr. Gapski reviewed documents relating to Mr. Owen's grievance history and attests to the grievance policy just described. He then attests to Mr. Owen's documented grievance history, explaining that prison records show no record of any grievance or appeal from Mr. Owen relating to the complaint during his time in restrictive housing. Mr. Owen filed grievances about other subjects like lost and stolen property on January 12 and April 7. Both were rejected with a return of grievance form. Then, on June 30, Mr. Owen filed a grievance about his cell condition, but it was returned as untimely. The defendants' exhibits support Mr. Gapski's account.

*Mr. Owen's Account*

Mr. Owen asserts that he exhausted all administrative remedies available to him. His evidence includes his own declaration and a copy of his June 30 grievance, which was rejected as untimely, [Doc. 30-7 at 85–91], the deposition transcript of Michael Gapski, the already-mentioned grievance specialist who also served as Rule 30(b)(6) representative for the prison, [Doc. 30-1], the deposition transcript of Charlene A. Burkett, the Director of the Indiana Department of Correction Ombudsman Bureau, [Doc. 30-2 to 30-5], and the

deposition transcript of Stacy Hall, a correctional officer and law librarian at Miami Correctional Facility, [Doc. 30-6].

According to Mr. Owen's declaration, he was placed in restrictive housing in January 2021. He was placed in a cell without light for one day, then moved to another cell without light for the rest of his sixty or so days in restrictive housing. He first filed a grievance about his cell conditions around January 12. He stapled the grievance to a request for interview form and asked that he be provided a copy of the grievance with the grievance number. He got no response. He didn't appeal the lack of a response because he was told he had to use Department of Correction forms to lodge an appeal, and he could get those forms only when he received a response to his grievance.

After forty-five days or so, Mr. Owen sent another request for interview form to the grievance specialists, asking about his grievance. He received no response. He then asked counselor K. Hopman what he could do, but K. Hopman said Mr. Owen had to wait for a response.

Mr. Owen filed another grievance around April 7, complaining about his cell's darkness and the physical and mental injuries it caused. He had been removed from restrictive housing when he filed the grievance and asked for damages, that staff be held accountable, and that the cells be fixed. He again stapled the grievance to a request for interview form, asking for a copy of the grievance and grievance number. He never heard a response. About forty-five days later, he requested an interview but heard nothing.

Mr. Owen filed a third grievance on June 30, 2021. He noted on the grievance that it was his third attempt to file a grievance about his cell condition. The grievance specialists returned the grievance as untimely. Mr. Owen says he never received the return of grievance form.

Mr. Owen presents Mr. Gapski's testimony as evidence that Miami Correctional Facility didn't follow department policy and made the grievance process impossible. Mr. Gapski, testifying as Miami Correctional Facility's Rule 30(b)(6) representative and described how grievance specialists at Miami Correctional Facility handled the grievance process. He explained that in restrictive housing, like Mr. Owen's unit, a prisoner wishing to file a grievance would complete a grievance form, hand it to a correctional officer, and the correctional officer would put the grievance in prison intraoffice mail to be delivered to the grievance specialists. No grievance is logged until a grievance specialist receives the grievance, and grievance specialists have no way of knowing whether or when a correctional officer accepted a prisoner's grievance, which correctional officer accepted a grievance, or what happened to a grievance that was sent but never received.

Mr. Gapski also described how Miami Correctional Facility handles appeals. The Indiana Department of Correction policy says a prisoner can appeal the prison's response to a grievance. A prisoner can appeal the prison's response or "may appeal as though the grievance had been denied" if there's no response within twenty business days of the offender grievance specialist's receipt of the grievance. [Doc. 17-2 at 12]. The policy adds that a prisoner who wishes to file a

first-level appeal must complete State Form 45473 and submit it within five business days of the date of the grievance response.

Mr. Gapski explained things differently, describing an extra unofficial step at Miami Correctional Facility. He said that the prison responds to grievances with an Offender Grievance Response Report. That report explains the prison's response and has a spot to mark "agree" or "disagree." It isn't State Form 45473, which the written policy requires for starting an appeal. If a prisoner wants State Form 45473, he marks "disagree" on the Offender Grievance Response Report and sends it to the grievance specialists. When a grievance specialist receives the report marked "disagree," the specialist sends a copy of State Form 45473 to the prisoner. That copy comes from a grievance specialist and must include the original grievance number on it. [Doc. 30-1 at 46–47]. The grievance specialists forward an appeal to the warden and send a receipt to the prisoner only once the specialists have received a completed State Form 45473.

Mr. Gapski also spoke of how timing is calculated. The grievance policy requires that a prisoner "submit a completed State Form 45471, 'Offender Grievance,' no later than ten (10) business days from the date of the incident given rise to the complaint." [Doc. 17-2 at 9]. The same is true for appeals, except that a prisoner has five business days instead of ten. [Doc. 17-2 at 14]. Mr. Gapski attested that grievance specialists calculate timing based on when they receive an appeal. So an appeal is deemed untimely if not *received* within five business days. Timing doesn't depend on when a prisoner signed an appeal or

handed an appeal to a correctional officer, even though prisoners often can't give an appeal directly to a grievance specialist.

Mr. Owen presents deposition testimony of Charlene Burkett, the Director of the Department of Correction Ombudsman Bureau. The Ombudsman Bureau handles prison complaints independently of the Department of Correction and Indiana Department of Administration but doesn't have enforcement power. The Ombudsman Bureau received several complaints from plaintiffs in the consolidated cases, each claiming that Miami Correctional Facility didn't respond to their grievances.

Likewise, Officer Stacy Hall, who was a law librarian in May or June 2021, attested that thirty to forty prisoners complained to her that their grievances didn't receive responses.

## Discussion

Mr. Owen and the defendants move for summary judgment on the exhaustion defense. The governing law is thoroughly set out in the court's opinion and order on cross-motions for summary in <u>Rollins v. Hyatte</u>, 3:21-CV-767-RLM-MGG, slip op. at 11–12, which discussion the court adopts by reference.

Warden Hyatte and Deputy Warden Payne's legal argument is straightforward: the prison's policies plainly require a formal grievance and two levels of appeal. Mr. Owen didn't properly file any grievance or appeal about his cell's conditions, so he didn't exhaust administrative remedies.

Mr. Owen's argument is similarly straightforward: he filed two grievances that didn't receive answers and later tried to file one that was untimely. Policy and practice made it impossible to appeal a non-response, so the first two grievances were fully exhausted.

Approaching from Mr. Owen's perspective makes for a clearer picture.

Mr. Owen claims he timely submitted a grievance about his cell conditions and didn't receive a response. Although the written policy required that prisoners appeal non-responses, it was impossible to do so in practice, so Mr. Owen exhausted all available remedies. Mr. Owen supports his claim with his declaration, in which he describes handing his grievance to a correctional officer and never receiving a response. According to Mr. Owen, prison officials consistently failed to respond, making the process unavailable. *See* Lewis v. Washington, 300 F.3d 829, 833 (7th Cir. 2002).

Mr. Owen's account appears to hit a snag with the grievance policy. A prisoner must follow any prison rules that require administrative appeals, id. (citing Pozo v. McCaughtry, 286 F.3d 1022, 1025 (2002)), and Miami Correctional Facility's policy required notifying grievance specialists of non-responses and also required that prisoners appeal non-responses.

According to policy, a grievance specialist is to respond to a grievance within fifteen business days of receipt. If a prisoner doesn't receive a response within twenty business days of when the grievance specialist receives the grievance, a prisoner is to appeal as if a response had come. The warden is to respond to an appeal within ten business days of receiving the appeal. If he

11

doesn't respond by then, a prisoner can appeal as if a response had come. Under these rules, Mr. Owen would exhaust administrative remedies only if he appealed the lack of a response to a grievance and appealed the first-level appeal response or lack of response.

This appeals process makes little sense for a prisoner who filed a grievance and receives no response. A prisoner must appeal a non-response as if it a response had come, but a prisoner can file an appeal only by filing State Form 45473. Mr. Gapski describes an unauthorized step requiring a prisoner to first mark another form with "disagree" before receiving State Form 45473. But a prisoner can't mark "disagree" on a form he never receives. This is a dead end.

The defendants insist that Miami Correctional Facility recognizes only the official policy, contrary to what Mr. Gapski says. But even if the prison follows the written policy to a tee, appeals are unavailable for non-responses. The policy tells prisoners to appeal as if the grievance had been denied but doesn't say how a prisoner is to get a copy of State Form 45473,[2] much less how a prisoner in restrictive housing, like Mr. Owen was, is to get hold of State Form 45473.

The same deficiencies apply to the second-level appeal. Policy dictates that a prisoner starts a second-level appeal by marking the warden's first-level response with "disagree." The defendants and the policy don't explain how a

---

[2]     Mr. Owen argues that the only way a prisoner gets State Form 45473 is to receive one from a grievance specialist after completing the unofficial and unauthorized step. The defendants object to this assertion as not supported by Mr. Gapski's testimony — he said that State Form 45473 comes from him but didn't exactly say that there was no other way to get the form. [Doc. 30-1 at 47]. Still, the defendants never explain how a prisoner who doesn't receive a response can get State Form 45473, nor does the written policy address this crucial step.

prisoner who receives no response to the first-level appeal can mark "disagree" on a form that he doesn't have and that might not even exist.

If Mr. Owen is believed, he has exhausted *available* remedies. He was supposed to appeal the prison's lack of response after the prison's time to respond lapsed, but that appeal was made impossible because Miami Correctional Facility required State Form 45473 to appeal. It provided State Form 45473 form only after a prisoner completed the unauthorized intermediate step involving the Offender Grievance Response Report. If the defendants are right and they followed the policy word for word, they still don't explain gaps in the policy that don't account for non-responses. Nothing in the written grievance policy tells a prisoner how to appeal if he never receives a response or State Form 45473. Ultimately, the policy's rules about appeals are "based on the assumption that the prisoner has received a response to his original grievance," and doesn't account for non-responses. Knighten v. Mitcheff, No. 1:09-cv-333, 2011 U.S. Dist. LEXIS 2910, at *8–9 (S.D. Ind. Jan. 10, 2011). This policy gap means "there is no adequate appeals process," so Mr. Owen "cannot be faulted for failing to appeal." Id. (citing Dole v. Chandler, 438 F.3d 804, 809–810 (7th Cir. 2006)).[3]

---

[3]   Another gap in the policy involves timing. Mr. Owen had to appeal a non-response within twenty business days of when grievances specialists received a grievance or ten business days of when the warden received an appeal. Timing didn't depend on when Mr. Owen signed or sent a grievance or appeal, and he had no way of knowing when someone else received his grievance or appeal. A prisoner who doesn't receive a response is apparently left to speculate about when an appeal of a non-response is due.

Mr. Owen is entitled to summary judgment on the affirmative defense[4] unless the defendants can somehow prove they're nevertheless entitled to judgment or can show that there's a genuine dispute of material fact requiring a Pavey hearing. *See* Pavey v. Conley, 544 F.3d 739 (7th Cir. 2008).

Warden Hyatte and Deputy Warden Payne argue that they're entitled to summary judgment because Mr. Owen didn't exhaust administrative remedies.

First, the defendants argue that *some* relief was available in the grievance process, so the process was available. For instance, Mr. Owen once filed a grievance about wanting fruit, sugar, and butter at breakfast. Mr. Gapski logged the grievance and responded, explaining that those items weren't available on the current menu. So, "although the process did not always provide [Mr. Owen] with the relief sought, the process was available." [Doc. 40 at 7].

This argument misapprehends the meaning of "some relief." They cite Ross v. Blake, 578 U.S. 632, 643 (2016) as saying that if the grievance process can produce "some relief" for one type of claim, then the process is available for other types of claims. But the language in Ross v. Blake isn't so broad. That language comes from Booth v. Churner, 532 U.S. 731 (2001), which held only that a prisoner can't evade the PLRA's exhaustion requirement by seeking a type of relief that's unavailable in the administrative process for that type of claim. Id. at 734 ("The question is whether an inmate seeking only money damages must complete a prison administrative process that could provide *some sort of relief*

---

[4]   Mr. Owen exhausted administrative remedies with his first two grievances so whether his June grievance was untimely makes no difference for the exhaustion defense.

*on the complaint stated*, but no money. We hold that he must.") (emphasis added). So if an administrative process would offer some non-monetary remedy for the type of claim in a grievance, a prisoner can't evade the exhaustion requirement by asking for money only. That's a far cry from saying that remedies are available for the type of complaint in a grievance (like one about cell conditions) because some remedy is available for an unrelated type of complaint (like one about food in the cafeteria). The defendants' argument would hold water if Mr. Owen claimed that remedies were unavailable only because the prison was incapable of giving him the relief he demanded. But Mr. Owen doesn't argue the remedies were unavailable because the prison was incapable of providing the type of relief he wanted — he contends that administrative remedies were unavailable because he couldn't appeal.

Next, the defendants argue that Mr. Owen has no evidence that he filed any appeal or otherwise exhausted administrative remedies, so they've met their burden. They say that otherwise, "any Plaintiff could succeed on a claim alleging that they exhausted administrative remedies simply by demonstrating that there is no record of any grievance submitted." [Doc. 40 at 7].

This argument falls short in two respects. First, Mr. Owen's declaration is evidence, and he claims he submitted two grievances that received no response, so he has produced evidence that he submitted grievances. The defendants conflate their evidence that grievances weren't received or recorded (Mr. Gapski explained that grievances aren't tracked until a grievance specialist receives

them), with evidence that Mr. Owen didn't submit any grievance. As Judge

Barker, in a similar case, explained:

> Although there is no record of any of these grievances in the prison database, that record is obviously only accurate as to the grievances that are actually inputted into the system by prison officials. In other words, even if a prisoner properly submits a grievance to an appropriate prison official, if the prison grievance specialist does not receive it, either because it is lost or forgotten, or if the grievance specialist fails for some other reason to input the grievance into the system, there would be no record of it having been filed.

Knighten v. Mitcheff, No. 1:09-cv-333, 2011 U.S. Dist. LEXIS 2910, at *6–7 (S.D.

Ind. Jan. 10, 2011).

Second, a prisoner's word might be all that he has. If a prison loses

grievances before they're filed, a plaintiff often has only the lack of records and

his own word to show exhaustion of remedies. As Judge D'Agostino observed, "it

is unclear what evidence Defendants expect Plaintiff to produce of his grievances

that were allegedly discarded by corrections officers." Reid v. Marzano, No. 9:15-

CV-761, 2017 U.S. Dist. LEXIS 38547, at *10 (N.D.N.Y. Mar. 17, 2017). Judge

D'Agostino noted that a prisoner would ideally keep photocopies for his records,

but that doing so was unrealistic because the plaintiff didn't have access to the

law library. Id. The same is true for Mr. Owen, even if he doesn't specifically

allege that correctional officers discarded these grievances; he was in restrictive

housing much of the time so it's unclear how he could have kept records for

himself. He apparently anticipated this problem since he included with his

grievances a request for a copy of the grievance and grievance number that might

be assigned to the grievance.

In the same vein, the defendants argue that the existence of some grievances shows that the process was available. Mr. Owen had other grievances that got filed, so he must have always been able to file grievances.

If proving non-exhaustion were as simple as showing that some other first-level grievances get logged, a prison official could get away with not responding to any appeals so long as the official made sure some fraction of grievances got filed. The logical conclusion to each of these arguments cut against the defendants; accepting that a prisoner can't rely on the lack of evidence of grievances would incentivize prisons to destroy or lose all grievances and prohibit prisoners from keeping copies of their grievances. A plaintiff would have only his word and the defendants could always reply, "our lack of records and your word aren't enough." The defendants warn against making the defense meaningless, but their position could lead to a perversely impenetrable defense.

The defendants' cite other prisoners' success with grievances as evidence that the process was available to Mr. Owen. For example, Jeremy Blanchard, a plaintiff in a consolidated case, 3:21-CV-160, completed all three steps. So, the defendants conclude, Mr. Owen must have been able to.

That the prison logged and responded to other grievances belonging to a different prisoner doesn't contradict Mr. Owen's claims. Mr. Owen claims that *his* grievances went unanswered, not that no grievance ever received a response. He includes evidence of systemic failures to bolster his claim, but his claim rests on his declaration. And Mr. Blanchard received responses, so he, unlike Mr.

Owen, didn't face the impossible task of appealing a non-response when an appeal requires a form that comes only with a response.

The defendants argue that administrative remedies were available because Mr. Owen received information about the process during admission and orientation and he has no evidence that he was never told how the process worked. This argument doesn't respond to Mr. Owen's evidence and argument. His argument depends on whether he was given responses and could appeal those responses in practice. His evidence shows that his grievances never received responses and that gaps in the policy (grievances aren't marked until received, the grievance specialists don't know who collects a grievance and when, and the like) allow grievances to go missing. Knowledge of how the policy worked couldn't make up for the impossibility of appealing a non-response.

The defendants suggest that if Mr. Owen's grievances weren't answered, he could still use the grievance process because "nothing prevents Plaintiff from submitting a subsequent grievance and attempting to establish 'good cause' for delay." [Doc. 40 at 10]. While it's true that grievance counselors could excuse untimeliness for good cause, the argument's implication goes too far, undermining the argument itself. To say that an unanswered grievance isn't exhausted because grievance specialists have discretion to excuse the untimeliness of later grievances would completely let prison officials off the hook for not responding to grievances. They would have license to not log or respond to any grievance because then when the time comes, they could invoke their grievance specialists' discretion for excusing untimeliness. Discretion in

excusing untimeliness would become a safety valve for prison officials' own inattentiveness or inadvertence or for the grievance system's gaps. The Prison Litigation Reform Act doesn't give prison officials license to "exploit the exhaustion requirement through indefinite delay in responding to grievances." Lewis v. Washington, 300 F.3d 829, 833 (7th Cir. 2002) (citation omitted). This line of reasoning would embody that type of exploitation.

Finally, the defendants object to some of Mr. Owen's evidence. They claim his declaration is too vague as to the grievances he says went unanswered; he says he "filed" the grievance without saying exactly what that means. But context and other evidence, like Mr. Gapski's testimony that prisoners hand grievances to prison officials to "file" them, alleviates the vagueness, if there is any to worry about. The defendants object to Mr. Owen's claim that K. Hopman told Mr. Owen to wait until he received a response to his grievance, claiming the statement is inadmissible hearsay. Inadmissible hearsay isn't proper at summary judgment. Carlisle v. Deere, 576 F.3d 649, 955 (7th Cir. 2009). But the statement is offered for its effect on the listener — misguiding Mr. Owen — rather than the truth of the matter asserted, so it's not hearsay. Cf. Fed. R. Evid. 801(c) (definition of hearsay).

At bottom, Warden Hyatte and Deputy Warden Payne's argument is that they're entitled to summary judgment because they have no institutional records of Mr. Owen's grievance. Their argument doesn't controvert Mr. Owen's evidence that he submitted a grievance because it rests on the faulty assumption that grievance specialists receive and log every grievance that a prisoner gives to

19

prison staff. Put differently, it assumes that a grievance doesn't get marked as received only if a prisoner didn't send it. Mr. Gapski's testimony about prison staff's inability to track grievances between when a prisoner tries to send it and the grievance specialists receive it refutes this premise. So while the defendants claim that the lack of institutional records of *these* grievances shows non-exhaustion, the lack of records is consistent with Mr. Owen's version of events.

The defendants' evidence is consistent with Mr. Owen's claims, so doesn't create a genuine issue as to whether administrative remedies were available to Mr. Owen. Administrative remedies weren't available to Mr. Owen, so he satisfied 42 U.S.C. § 1997e(a) before suing.

A court normally holds a Pavey hearing to resolve factual disputes bearing on administrative exhaustion, but needn't hold a hearing if it can resolve the issue of exhaustion on the documentary evidence. Bessler v. Wexford of Ind. LLC, No. 3:21-CV-691, 2022 U.S. Dist. LEXIS 199409, at *7–8 (N.D. Ind. Nov. 2, 2022). Neither party requested a Pavey hearing and the consistency between Mr. Owen's claim of exhaustion and the defendants' evidence means there's no genuine issue of material fact. Accordingly, the court denies the defendants' motion for summary judgment and grants Mr. Owen's motion for summary judgment without a Pavey hearing.

Mr. Owen requested oral argument to help the court narrow its focus on the voluminous records and briefs across the consolidated cases. Oral argument is unnecessary, so the court denies the request for oral argument.

CONCLUSION

For these reasons, the court DENIES the defendants' motion for summary judgment; GRANTS Mr. Owen's motion for summary judgment; REJECTS the exhaustion defense; and DENIES AS MOOT Mr. Owen's motion for consolidated oral argument.

SO ORDERED.

ENTERED:   August 15, 2023

_____/s/ Robert L. Miller, Jr._
Judge, United States District Court